Jacob and Charlotte K. Mark v. Commissioner.
Jacob & Charlotte K. Mark v. Commissioner
Docket No. 24092.
United States Tax Court
1951 Tax Ct. Memo LEXIS 149; 10 T.C.M. (CCH) 702; T.C.M. (RIA) 51225; August 7, 1951
*149 Asher Lans, Esq., for the petitioners. William E. Murray, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies of $225.90 and $4,302.51 in the income tax of the petitioners for 1942 and 1944, respectively. The only issues are whether the respondent erred (1) in determining that an amount of $127,000 deducted by the petitioners in their 1943 return was a nonbusiness bad debt allowable as a short-term capital loss instead of allowing the amount in its entirety as a bad debt deduction, and (2) in disallowing a deduction taken by petitioners in their 1944 return as a net operating loss carried forward from 1943. Findings of Fact Part of the facts were stipulated and are found accordingly. The petitioners are husband and wife and filed their 1943 and 1944 joint income tax returns with the collectors for the third and second districts of New York, respectively. Petitioner Jacob Mark is licensed to practice as a civil engineer in the State of New York and has engaged in engineering work since 1910, but only incidentally since 1928. Mrs. Mark has independent means obtained principally as gifts *150 made by Jacob during the early years of their marriage, of the period, 1920 to 1928, when he engaged in the iron business. In June 1927 Jacob Mark contracted to purchase the land situated at 47 Plaza Street, Brooklyn, New York, making a payment thereon of $25,000. Thereafter in July 1927 the petitioners, in association with others, organized Forty-Seven Plaza Street Corporation, sometimes hereafter referred to as Plaza, under the laws of the State of New York. Following the organization of Plaza, Jacob assigned his purchase contract to Plaza which, on August 1, 1927, consummated the purchase. Plaza was organized to acquire land, engage in building and rental operations and any other operations incidental to the purchase, improvement, operation or sale of real estate. Its authorized capital stock was $50,000 consisting of 500 shares of a par value of $100 each. However, a total of only $500 par value of stock or 5 shares were issued. Seventy-five per cent of this stock was issued to the petitioners and the remaining 25 per cent to six other individuals. Following its acquisition of the abovementioned land Plaza, in 1927 and 1928, constructed an apartment house on the premises *151 with units ranging in size from 6 rooms and 3 baths to 10 rooms with 3 or more baths. The total cost of the land and building was approximately $875,000. That amount was raised by a building loan of $675,000 secured by a first mortgage on the property which Plaza obtained from the New York Title and Mortgage Company, by loans made to Plaza by its stockholders and by payments to Plaza for its capital stock. Loans were advanced by the stockholders to Plaza as its building operations and needs required. The total of the amounts so advanced to December 1928 by the petitioners, including the $25,000 paid on the land purchase contract, was $161,500. From 1928 or 1929 until about 1933 Plaza made payments on its mortgage and other indebtedness and paid some dividends on its stock. Beginning about 1933 and continuing until dissolution in 1943 Plaza had financial difficulties as a result of its inability to obtain a sufficient number of tenants to operate profitably enough to meet its obligations under the mortgage as well as under its other indebtedness. During and after the middle 1930's the petitioners made further loans to Plaza some of which were repaid and others were not. Over a period *152 of several years Jacob Mark tried unsuccessfully to obtain some favorable adjustment in the terms of payment of the mortgage. He also sought unsuccessfully to obtain forgiveness of a portion of the indebtedness. He tried to refinance the mortgage with other lenders but was unable to do so. In this situation and since the petitioners were without funds to assist Plaza in meeting its obligations under the mortgage, Plaza in January 1943, in lieu of foreclosure executed a deed to the land and building to the Superintendent of Insurance of New York State, who was the liquidator of the New York Title and Mortgage Company, the mortgagee of the premises. Thereupon Plaza's remaining assets consisted solely of $1,044.69 in cash which shortly afterwards was distributed in part payment of Plaza's remaining indebtedness. The amount so received by the petitioners reduced to $127,000 the indebtedness owing to them by Plaza. Thereafter in June 1943 Plaza dissolved without assets of any kind and without any portion of the $127,000 having been paid to the petitioners. From the time of its organization until its dissolution Jacob Mark was president, treasurer and a director of Plaza and managed its *153 affairs. Mrs. Mark also was a director. In addition to their participation in the organization, financing and operation of Plaza, the petitioners, beginning in 1922 and continuing into 1936, alone or in association with others, organized ten corporations and made loans to them as follows: "122 East 51 Street Corporation was organized by petitioners and two others in 1922 to acquire land and erect an apartment house thereon. Jacob Mark helped plan the building and advised as to its economic aspects. The corporation operated the building for about 10 years after completion and then sold it. A first mortgage of about $250,000 was placed on the property and also a second one for about $100.000. Aside from acquiring stock in the corporation the petitioners loaned it approximately $10,000. "Murray Hill Office Corporation was organized in 1924 by petitioners and several others to erect an office building. Jacob Mark assisted in the planning and designing of the building and in arranging for the financing required for its construction. Sometime subsequent to the completion of the building the property was sold. In addition to the stock they acquired in the corporation the petitioners *154 loaned it $56,000. "Wander Mark Construction Corporation and 51 Lexington Avenue Corporation were organized about 1925 or 1926 by petitioners and Samuel Wander and wife. These corporations acquired land, erected garage buildings thereon and after leasing them for about four years sold them and dissolved. Jacob Mark assisted in designing the buildings, in arranging for the financing required for their construction and in supervising their leasing. Aside from acquiring stock in the corporations the petitioners loaned them between $150,000 and $175,000. "Berkeley Plaza Corporation was organized in 1926 by petitioners and Samuel Wander and wife. The four organizers were officers and directors of the corporation. The corporation purchased land and erected a building thereon. The property was sold by the corporation after it had been rented for a time. Jacob Mark assisted in planning the building, supervising its construction and in its rental prior to sale. In addition to acquiring one-half of the corporation's stock the petitioners loaned the corporation approximately $125,000 which was used in the construction of the building. "Kram Realty Corporation was organized by petitioners *155 in 1927 and they acquired all of its stock. The corporation acquired land and erected some garages and stores thereon which it subsequently sold. The corporation also engaged in a few other similar operations. Jacob Mark was president and Mrs. Mark was treasurer of the corporation. They continued their stock ownership in the corporation from its inception until its dissolution in 1945. At various times but principally in 1930 and 1931 the petitioners loaned the corporation sums totalling about $150,000. "Marnel Realty Corporation was organized by petitioners and James W. Nelson and wife in 1936. The four were officers in the corporation. The petitioners acquired one-half of its stock and the Nelsons the remainder. The corporation was organized to do a general real estate business in tax liens, the purchase and sale of real estate and the alteration of buildings. Jacob Mark was secretary and a director of the corporation and participated in all the transactions in which the corporation engaged. The corporation continued in business until about 1940. The petitioners loaned the corporation about $100,000 and the Nelsons loaned it about the same amount. "101 Lafayette Avenue Corporation *156 was organized by the petitioners in 1931 and each acquired 50 per cent of its stock. The corporation acquired land and erected an apartment house thereon. The petitioners loaned the corporation approximately $150,000 which was used in the construction of the building which, upon completion, was transferred to South Oxford Realty Corporation. "South Oxford Realty Corporation was organized by petitioners in 1932 and each acquired and continues to own one-half of its stock. The corporation was organized to acquire and operate the property mentioned in the preceding paragraph and continues to own and operate it. Over the period since 1932 the petitioners have made loans to the corporation from time to time when it was in need of funds to pay operating expenses or to purchase equipment. "99 Lafayette Avenue Corporation was organized by petitioners and James W. Nelson and wife in 1935. The petitioners acquired one-half of the stock of the corporation which they continue to own. The corporation purchased land and erected a building thereon which it continues to own. The corporation also acquired an adjacent property which it still owns. Jacob Mark has been secretary of the corporation *157 since its inception and has actively managed its properties. Prior to the time the corporation obtained a $200,000 loan on its properties the petitioners loaned the corporation a total of about $110,000, the greater part of which has been repaid." The petitioners also participated in the following syndicates: "About 1926 the petitioners joined with two others in a syndicate which purchased and sold certain real estate and the leasehold on certain land on which there was an office building. The petitioners loaned this syndicate about $20,000. "In 1927 or 1928 the petitioners joined with two others in a syndicate to purchase certain real estate. The petitioners later sold their interest in the syndicate to one of the other parties in the syndicate. The petitioners loaned about $30,000 to the syndicate. "About 1926 or 1927 the petitioners loaned about $20,000 to Franklin Hotels, Inc., which had acquired a lease on certain land and was at that time engaged in constructing a hotel building thereon. In 1926 the petitioners loaned about $10,000 to 110th Street and Riverside Drive Corporation which bought an apartment house." The petitioners also purchased stock in other corporations *158 in whose organization they did not participate as follows: "About 1926 or 1927 the petitioners purchased stock in Miami Beach Realties, Inc., which bought land and buildings. They also made a loan to the corporation. "About 1937 the petitioners acquired stock in Washington Realty Company and loaned the corporation about $27,000. The corporation purchased land and in 1937 erected an apartment house thereon. Jacob Mark assisted in the planning, supervision of construction and rental of the building. He also assisted in arranging for a mortgage on the property. The corporation was dissolved in 1943 and the land and building were transferred to a partnership of which the petitioners were members. The partnership operated the property until 1949 when it was sold and the proceeds remaining after payment of indetedness were distributed to the partners. Prior to 1949 the petitioners had received part repayment of their original loan of $27,000. "In 1937 the petitioners acquired about five per cent of the outstanding stock of Schachnow Realty Corporation. The corporation was organized to acquire land and erect buildings thereon. The petitioners made some loans to the corporation. In 1942 *159 the petitioners sold their stock in the corporation to one of the organizers. Notes given by him to the petitioners therefor were paid over the years 1942, 1943 and 1944. "In 1937 the petitioners acquired stock in 2725 University Avenue Corporation which they continued to own until 1940. The corporation was organized to purchase land and erect a building on it. The petitioners also made loans to the corporation. About 1940 the corporation sold the land and building, made payment of the loans owing by it and distributed the remaining proceeds to its stockholders. "In 1938 the petitioners acquired stock in Taxford Realty Corporation which was organized to acquire a store property. They also made a loan to the corporation which was repaid during 1941, 1942 and 1943. In 1943 the petitioners sold their stock to one of the corporation's organizers. "L.S.R. Realty and Construction Corporation was organized about 1939 or 1940 and purchased land and erected and altered buildings. The petitioners acquired stock in the corporation and made loans to it. The loans have been repaid in part. "The Bronx Borough Company, Inc., was organized about 1936 for the purpose of financing building loans *160 and mortgages. From the corporation's inception until its dissolution in 1942 the petitioners owned about five per cent of its stock." Of the corporations heretofore mentioned the petitioners owned stock in the following at the beginning of 1943: Forty-Seven Plaza Street Corporation, Kram Realty Corporation, South Oxford Realty Corporation, 99 Lafayette Avenue Corporation, Washington Realty Company, Taxford Realty Corporation, L.S.R. Realty and Construction Corporation. In 1943 the following corporations were indebted to the petitioners on loans the petitioners had made to them: Forty-Seven Plaza Street Corporation, 99 Lafayette Avenue Corporation, Washington Realty Company, Taxford Realty Corporation, L.S.R. Realty and Construction Corporation Continuing in 1944 the petitioners owned stock in the following of the foregoing corporations: Kram Realty Corporation, 99 Lafayette Avenue Corporation, South Oxford Realty Corporation, L.S.R. Realty and Construction Corporation In 1944, 99 Lafayette Avenue Corporation and L.S.R. Realty and Construction Corporation were indebted to petitioners on loans the petitioners had made to them. Also in that year a portion, if not all, of *161 the $27,000 loan originally made by petitioners to Washington Realty Company and continued by the successor partnership was owing to the petitioners. During 1944 the petitioners acquired stock in the following corporations: Glen Cove Academy Gardens, Glen Cove Gardens and Lattinktown Harbor Estates. These corporations, to which the petitioners loaned about $12,000 purchased land for housing developments. In 1944 the petitioners purchased three parcels of real estate at costs of $20,000, $19,000 and $6,000, respectively. Subsequently these properties were acquired by L.S.R. Realty and Construction Corporation. During 1943 and 1944 Jacob Mark maintained an office at 101 Lafayette Avenue, Brooklyn, and although he had a real estate brokers' license he did not hold himself out as being engaged in that business generally. His real estate management and rental agent activities were limited to the properties of corporations in which he and Mrs. Mark owned a controlling interest. In these years he devoted approximately 90 per cent of his time to managing the properties and looking after the affairs of 99 Lafayette Avenue Corporation, South Oxford Realty Corporation, L.S.R. Realty and Construction *162 Corporation and assisted in managing property of Washington Realty Company up to the time of its dissolution in 1943. He was an officer in these corporations. He devoted about 10 per cent of his time to work as a real estate consultant, appraiser and witness in connection with the property of others which was involved in condemnation proceedings or was taken for public use. In their 1943 income tax return the petitioners deducted as a business bad debt the $127,000 of loans made by them to Plaza which remained unpaid at the time of its dissolution without assets in that year. The respondent determined that the amount was a nonbusiness bad debt and as such was deductible as a short termcapital loss and disallowed the deduction as taken but allowed a deduction of $1,000 for a capital loss. The unpaid $127,000 of loans made by the petitioners to Plaza became worthless during 1943. In their 1944 income tax return the petitioners deducted $112,634.28 as a net operating loss carried forward from 1943. The respondent determined that the amount was not allowable and disallowed it but allowed a capital loss carry-over of $1,000 from 1943. Opinion Relying on our holding in Vincent C. Campbell, 11 T.C. 510 *163 (respondent's acquiescence, 1949-1 C.B. 1), the petitioners contend that the deduction taken in their 1943 return with respect to the unpaid portion of the Plaza loans constituted a business bad debt and not a nonbusiness bad debt as determined by the respondent. The respondent contends that his action should be sustained. In support of his contention he argues among others, certain matters inconsistent with his determination as disclosed in the deficiency notice. Since under the rules of the Court this is not permissible without affirmative pleadings on the respondent's part and since such pleadings have not been filed no consideration is given to such matters. In the Campbell case the taxpayers for 15 years had engaged in organizing, owning and operating corporations which conducted the retail coal business. During that period the petitioners had organized 12 such corporations and in many instances had advanced to or left money with them on open account. We there held that the indebtedness resulting from money so left with one of the corporations and which became uncollectible and a worthless debt in 1944 constituted a business bad debt and not a nonbusiness bad debt *164 as the respondent had determined. From the facts presented we think our holding in the Campbell case is applicable here. See also Weldon D. Smith, 17 T.C. -, promulgated July 31, 1951. The respondent's disallowance of the 1943 net operating loss carried forward and deducted by the petitioners in 1944 appears to have resulted from his determination that the $127,000 deducted in 1943 represented a nonbusiness bad debt. Since we have concluded that it was a business bad debt, such 1943 net operating loss as results from that holding will be carried forward and given effect to in the recomputation of the 1944 income tax liability of the petitioners. Decision will be entered under Rule 50.